**Mildred S. DELYRIA, Plaintiff,**

**v.**

**Donna E. SHALALA, Secretary of Health and Human Services, Defendant.**

**No. CV–93–734–ST.**

United States District Court,
D. Oregon.

June 2, 1994.

David S. Tilton, Oregon Legal Services Corp., Coos Bay Regional Office, Coos Bay, OR, for plaintiff.

Craig J. Casey, Asst. U.S. Atty., Portland, OR, Richard H. Wetmore, Sp. Asst. U.S. Atty., Seattle, WA, for defendant.

## OPINION AND ORDER

STEWART, United States Magistrate Judge:

### *INTRODUCTION*

Claimant, Mildred S. Delyria, brings this action pursuant to the Social Security Act

("Act"), 42 U.S.C. § 405(g) *et seq,* to obtain judicial review of a final decision of the Secretary of Health and Human Services ("Secretary"). The Secretary denied claimant's application for Disability Insurance Benefits ("DIB"). All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 U.S.C. § 636(c). For the reasons set forth below, the Secretary's decision is reversed and remanded with an order to enter a finding of disabled and award benefits to claimant.

## PROCEDURAL BACKGROUND

Claimant applied for DIB on June 7, 1988 claiming that she became unable to work on February 14, 1988 because of her disability condition (Tr 77–80).[1] The application was denied initially (Tr 82–83) and upon reconsideration (Tr 89–90). Claimant did not seek further review under 20 C.F.R. § 404.933(a) and (b).

Claimant applied for DIB a second time on June 4, 1991, again claiming that she became unable to work on February 19, 1988[2] (Tr 91–93). The application was apparently denied and claimant requested reconsideration (Tr 94). The record does not indicate what happened to this request (Tr 106).

Claimant applied for DIB a third time on September 13, 1991, again claiming that she became unable to work on February 19, 1988 (Tr 97–100). The application was denied initially (Tr 116–117) and upon reconsideration (Tr 130–131). Claimant filed a timely request for a hearing before an Administrative Law Judge ("ALJ") (Tr 132). Claimant, represented by counsel, appeared and testified before the ALJ on December 7, 1992, as did a vocational expert ("VE") (Tr 32–76). On December 24, 1992 the ALJ denied claimant's request for DIB (Tr 14–24). This decision became the final decision of the Secretary when the Appeals Council declined to review the ALJ's decision (Tr 6–7).

1. Claimant and defendant cite June 5, 1988 as the date she applied for DIB. However, the application was filed at the Coos Bay Social Security Administration office on June 7, 1988 which is the date this court will use.

## STATEMENT OF THE FACTS

Claimant, a resident of Brookings, Oregon, was born on April 21, 1939 in Yakima, Washington (Tr 36). She has a high school degree (Tr 37–38). Her past relevant work was as a health aide for the elderly (Tr 147). Her most recent work involved in-home service for the elderly which required making beds, washing dishes, doing laundry, vacuuming, carrying heavy bags, carrying firewood, and performing general housework duties (Tr 40–41). No training was required for this job (Tr 40). Claimant developed back and shoulder problems in 1987 (Tr 47) and left her job in February 1988 because of those problems (Tr 41, 234). She obtained workers' compensation benefits for approximately six months (Tr 42).

Claimant asserts that she cannot return to work due to her back and shoulder problems (Tr 46). In 1987 and 1988 claimant was seen by Dr. Laurence E. Taylor, her treating physician, complaining of back pain radiating from her flanks (Tr 193–194). In 1987 claimant was also seen by Dr. Curtis Adams, an orthopedic surgeon. He diagnosed mild scoliosis and a congenital defect at L1–L2 (Tr 217–218).

In 1988 claimant reported continued shoulder difficulties to Dr. Taylor who referred her back to Dr. Adams (Tr 197–198). In August 1988 Dr. Adams diagnosed adhesive capsulitis ("frozen shoulder") on the right shoulder (Tr 235) and performed shoulder manipulation and subacromial injection (Tr 239). Claimant reported to Dr. Taylor improvement to the range of motion of her shoulder throughout 1988 and into February 1989 (Tr 225).

In April 1989, Dr. Adams noted that claimant was medically stationary and could do modified work (Tr 259–260). "The only restriction would be the pushing and pulling, which she describes as being bothersome" (Tr 260). In August 1989, Dr. Edmonde

2. Although claimant's original claim notes that she was unable to work since February 14, 1988, subsequent applications cite February 19, 1988 as the onset of her disability. This court has found no explanation for the discrepancy.

Samuel, D.C. evaluated claimant and stated that she needed to do particular exercises for her shoulder (Tr 265). On August 23, 1989 he reported that claimant had shown improvement "in terms of pain, but no significant improvement in terms of motion," that she could not perform extended physical activities using her hands and arms, especially her right arm, and that she was not medically stationary (Tr 266). Dr. Samuel completed a residual function capacity form for the state workers' compensation program releasing claimant for work August 31, 1989. He opined that claimant could walk or stand eight hours a day with breaks, could sit seven to eight hours a day with breaks; could lift up to 10 pounds intermittently; but could not push and pull or reach above shoulder level with her right arm and could not crawl; and could not climb a ladder (Tr 267).

The record reveals that the only medical visits claimant had in 1990 were with Dr. Taylor regarding complaints of abdominal pain, which resolved after a week (Tr 202). Claimant was advised to adjust her diet. At some time in 1991 claimant testified that she was diagnosed with diabetes (Tr 37).

In September 1991 claimant was treated by Dr. William J. Bernstein, a neurologist, for back problems (Tr 275–278). He noted a gradually worsening tightness around her abdomen and difficulty in sleeping which improved when she slept on a wedge (Tr 275). Dr. Bernstein diagnosed that it was most likely claimant had a lower thoracic spinal cord mass, specifically a "congenital lesion" such as a teratoma or lipoma (Tr 277).

In October 1991, claimant again saw Dr. Bernstein (Tr 284). He noted that claimant's condition had not altered, reporting the same diagnosis of September 1991. In November 1991 Dr. Bernstein reported that claimant had been diagnosed as diabetic (Tr 285). With that information, Dr. Bernstein concluded that claimant "probably had a small vessel infarction of her posterior columns, four years ago secondary to her diabetes, similar to a lacunar brain infarction" (Id). Dr. Bernstein believed this was the cause of claimant's symptomatology (Id).

Dr. Taylor stated in a letter in January 1992 that claimant could not stand for a long period of time and was limited in lifting, carrying, and handling objects in a repetitive motion (Tr 292). He noted that claimant had been recently diagnosed for Type II adult onset diabetes mellitus (Id.).

Dr. Taylor completed a residual functional capacity form in September 1992 (Tr 303–306). He reported that claimant could stand from one to four hours; sit from one to four hours; occasionally lift up to 10 pounds, but never above that amount; walk a quarter of a mile; and occasionally kneel but not bend. Dr. Taylor concluded that claimant could do "sedentary work" (Tr 306), adding that claimant's capabilities "may vary depending on how well she is doing with her back pain on that day" (Tr 305). Dr. Taylor also filled out a pain questionnaire, stating that claimant reported experiencing constant daily pain of varying severity (Tr 307). He noted that the only signs of pain he observed were her subjective complaints, but that her complaints were consistent with objective medical findings. He noted that "it is difficult to measure chronic back pain" (Tr 307).

In November 1992, Dr. Bernstein completed a similar form (Tr 298–301). Dr. Bernstein noted that claimant could stand for one hour without interruption and one to four hours total a day; sit for one to four hours without interruption and four to six hours total a day; lift up to, but no more than, 10 pounds frequently; walk fifty yards but rarely bend or kneel (Tr 298–300). Dr. Bernstein concluded that claimant could do "sedentary work," lifting no more than 10 pounds, occasionally lifting and/or carrying small objects, sitting, and a certain amount of walking and standing (Tr 301). Dr. Bernstein also completed a pain questionnaire in which he noted that claimant experiences moderately severe upper lumbar pain and that her complaints of pain were consistent with objective medical findings (Tr 302).

Claimant testified at her hearing that she now experiences dizzy spells (Tr 43). She has two kinds of spells, one where the room is spinning, she gets sick and has to lay down (Tr 49). The other is a strobe-light effect, where she feels like she is going in and out (Tr 49). Claimant testified that these can

vary from daily to once every two to three days. Claimant experienced the first type of dizzy spells when her back problems began, but experienced the strobe-light spells only after she got diabetes (Tr 50).

Claimant testified that she had taken pain medication in the past, but it did not help the pain and made her groggy so she has discontinued any medication (Tr 46, 66). She continues to have bad pain in her back, which makes her feel as if her whole insides are hurting; she swells up and her back becomes very tender (Tr 54). Her right shoulder does not bother her much unless there is pressure on it (*Id*).

Claimant drives a few times a week, if she is not dizzy (Tr 56); no longer engages in sport activities (Tr 57); walks about five blocks every morning and does the light housework, cooking and dishes, while her husband does the heavier work including vacuuming and making the bed (Tr 57–58). Claimant can no longer garden because she cannot put any pressure on her right arm (Tr 58). She can stand for a couple of hours before the pressure on her back begins (Tr 52). She has a problem bending which is aggravated if she has to push or pull anything (Tr 52). She can sit comfortably for a few hours when she is using the wedge in a slouching position, but she cannot comfortably lie flat (Tr 53). She has recent problems with her memory and concentration since she became diabetic (Tr 53–54).

Francine Gomez testified as the VE at claimant's hearing (Tr 69–74, 76). The ALJ posed a few hypotheticals to Ms. Gomez. First he asked her to take into account claimant's age of 51 years, her high school education and a year of business college afterwards, the fact that she is literate, her past work history as a home health aide, and her physical complaints, including adhesive capsulitis which would restrict her from a job entailing pushing, pulling, repetitive bending and kneeling (Tr 71–72). The ALJ instructed the VE that claimant would have the capacity for "light work" with these restrictions (Tr 71). The ALJ went on to stipulate that claimant needs a job that would allow a sit/stand option, without requiring a fully upright sitting position for a prolonged period

(*Id.*). In addition, he noted that claimant can stand and sit for a couple of hours before experiencing pain and because of the pain, should not have any jobs that would require sustained concentration on complex tasks (Tr 71–72). Simple routine work would be most appropriate (Tr 72).

Based on these limitations, the VE determined that claimant would not be able to return to her past relevant work (Tr 72). However, the VE identified assembler type jobs, which would allow sitting and standing and are light in nature, as appropriate for the limitations described (Tr 72). The specific assembly jobs include a joiner, assembler of small parts and paper sorter. There are approximately 7,300 jobs of this nature in Oregon (Tr 72–73). In the national economy there are 861,937 assembler jobs (Tr 76). In addition, there are also molding and casting machine operator jobs. These jobs are light in nature (Tr 73). There are approximately 400 molding and casting machine operator jobs in available in Oregon (Tr 73) and 20,219 such jobs nationally (Tr 76).

The ALJ posed a second hypothetical which included the limitations described above, but added claimant's occasional dizzy spells with a strobe light effect which would impair her concentration, come on an unpredictable basis and distract her from performing a task for half an hour to an hour (Tr 73–74). Based on these restrictions, the VE testified that claimant would not be able to perform any of the above mentioned jobs (Tr 74). The ALJ did not pose a hypothetical which limited claimant's lifting ability to not more than 10 pounds or one which limited claimant to "sedentary work."

### THE SECRETARY'S DECISION

The ALJ made the following findings:

1. The claimant met the disability insured status requirements of the Act on January 6, 1989, the date of the most recent unfavorable determination, and continued to meet them September 30, 1990.

2. The claimant has not engaged in substantial gainful activity since January 6, 1989.

3. The medical evidence establishes that through the date last insured the claimant had a congenital anomaly at L1–2 and adhesive capsulitis of her right shoulder, but that she did not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's description of her pain and other limitations is found to be generally credible but insufficient to support the conclusion that she was disabled prior to the date she was last insured.

5. The claimant had the residual functional capacity to perform the physical exertion and nonexertional requirements of work except for lifting more than 20 pounds (20 CFR 404.1545).

6. The claimant was unable to perform her past relevant work as housekeeper.

7. The claimant's residual functional capacity for the full range of light work was reduced by the additional limitations that she should avoid repetitive pushing and pulling and prolonged sitting, standing or walking.

8. The claimant was 51 years old on the date last insured, which is defined as approaching advanced age (20 CFR 404.-1563).

9. The claimant has a high school education (20 CFR 404.1564).

10. The claimant does not have any acquired work skills which are transferable to the skilled or semiskilled work functions of other work (20 CFR 404.1568).

11. Based on an exertional capacity for light work, and the claimant's age, education, and work experience, section 404.-1569 and Rule 202.13, Table No. 2, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

12. Although the claimant's additional nonexertional limitations do not allow her to perform the full range of light work, using the above-cited rule as a framework for decisionmaking, there are a significant number of jobs in the national economy which she could perform. Examples of such jobs are: small parts assembler, paper sorter and molding or casting machine operator. There are approximately 850,-000 such jobs in the national economy and 7,700 such jobs in the State of Oregon.

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date she was last insured (20 CFR 404.1520(f)).

(Tr 23–24).

### STANDARD OF REVIEW

This court must affirm the Secretary's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. *Hammock v. Bowen,* 879 F.2d 498, 501 (9th Cir.1989). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) *quoting Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938). The court must weigh "both the evidence that supports and detracts from the Secretary's conclusions." *Martinez v. Heckler,* 807 F.2d 771, 772 (9th Cir.1986).

The initial burden of proof rests upon the claimant to establish disability. *Howard v. Heckler,* 782 F.2d 1484, 1486 (9th Cir.1986). To meet this burden, claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Secretary has established a five-step sequential process for determining whether a person is disabled. *Bowen v. Yuckert,* 482 U.S. 137, 140, 107 S.Ct. 2287, 2291, 96 L.Ed.2d 119 (1987); 20 C.F.R. § 404.1502. First the Secretary determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. *Yuckert,* 482 U.S. at 140, 107 S.Ct. at 2291; 20 C.F.R. § 404.1520(b).

In step two the Secretary determines whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert,* 482 U.S. at 140–41, 107 S.Ct. at

2291; *see* 20 C.F.R. § 404.1520(c). If not, the claimant is not disabled.

In step three the Secretary determines whether the impairment meets or equals "one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity." *Id.;* *see* 20 C.F.R. § 404.1520(d). If so, the claimant is conclusively presumed disabled; if not, the Secretary proceeds to step four. *Yuckert,* 482 U.S. at 141, 107 S.Ct. at 2291.

In step four the Secretary determines whether the claimant can still perform "past relevant work." 20 C.F.R. § 404.1520(e). If the claimant can work, she is not disabled. If she cannot perform past relevant work, the burden shifts to the Secretary.

In step five, the Secretary must establish that the claimant can perform other work. *Yuckert,* 482 U.S. at 141–42, 107 S.Ct. at 2291–92; *see* 20 C.F.R. § 404.1520(e) & (f). If the Secretary meets this burden and proves that the claimant is able to perform other work which exists in the national economy, she is not disabled. 20 C.F.R. § 404.-1566.

## *DISCUSSION*

Claimant objects to the ALJ's decision for two reasons. First, claimant asserts that the Social Security notice of reconsideration given in the determination of claimant's first application for disability benefits (Tr 89–90) violated claimant's Fifth Amendment right to procedural due process. Second, claimant contends that the ALJ's decision in the present application is not supported by substantial evidence that claimant is able to perform "light work."

## I. *Fifth Amendment Procedural Due Process*

■ Claimant last met the disability insured status requirements on September 30, 1990 (Tr 14–15, 94, 136). Claimant's first application for DIB was denied after reconsideration on January 6, 1989 ("1989 Recon-

sideration Notice") (Tr 89–90). Because claimant failed to seek timely review of that denial, the ALJ determined that the period during which claimant must prove that she became disabled is between January 7, 1989, the date she was last found to be not disabled (Tr 89–90), and September 30, 1990, the last date she met the insured requirements (Tr 23). Claimant objects to the January 7, 1989 date, arguing that her benefits should be calculated from the date of her initial unappealed application of August 25, 1988.[3]

To support the earlier date, claimant contends that under *Gonzalez v. Sullivan,* 914 F.2d 1197 (9th Cir.1990) the 1989 Reconsideration Notice violated her Fifth Amendment right to procedural due process. Thus, claimant argues that her failure to seek timely review of that notice should be waived, such that her disability benefits should start on the date of her initial application, rather than on January 7, 1989.

In *Gonzalez* the court held that the form of notice used by the Secretary was "sufficiently misleading that it introduced a high risk of error into the disability decisionmaking process." *Gonzalez,* 914 F.2d at 1203. The flawed notice denying benefits contained the following:

> If you do not request reconsideration of your case within the prescribed time period, you still have the right to file another application at any time.

*Id.*

■ This type of notice violates procedural due process requirements because it is not reasonably calculated to afford the party a right to present objections. Specifically, it fails to clearly indicate that if no request for reconsideration is made, the determination is final. As such, an applicant is not fully informed of the consequences of filing a new application rather than appealing the old one. An applicant filing a new application, rather than continuing the appeal process, may face a claim of res judicata or receive less in retroactive benefits than one would have received had one successfully appealed the ini-

---

**3.** Claimant requests that benefits be calculated from August 25, 1988, the date her first application was denied. However, this court is not certain that this date is correct. The correct date may be the date claimant filed her initial application, June 7, 1988, or the date she became disabled, February 14 or 19, 1988.

tial decision. *Id.* Day, Brown, Clide, Kinsler v. Shalala, Secretary of Health and Human Services, 23 F.3d 1052, 1065 (6th Cir. 1994).[4]

On September 30, 1992, in response to *Gonzalez*, the Social Security Administration issued Acquiescence Ruling 92–7(9) ("AR 92–7(9)"). *Federal Register*, Vol 57, No 190 at 45061–2. That Ruling is limited to the Ninth Circuit and applies only to claimants who received an adverse initial determination prior to July 1, 1991 and did not timely appeal. *Id.* at 45062.

The 1989 Reconsideration Notice received by claimant was similar to that in *Gonzalez*. That notice, although slightly different, states the following:

> If you do not request a hearing of your case within the prescribed time period, you still have the right to file another application at any time.

(Tr 89–90).

Claimant did not request a hearing, but instead filed a new application. The Secretary argues that *Gonzalez* and AR 92–7(9) are limited to misleading *initial* applications and therefore do not apply to the 1989 Reconsideration Notice. Furthermore, because claimant was not misled and actually requested reconsideration of the initial denial, the ALJ concluded that *Gonzalez* did not apply (Tr 15). Because claimant has a high school education, the ALJ felt that she apparently did not lack the mental capacity to understand the procedures for review (*Id.*).[5]

■ Contrary to the Secretary's position, interpretation of AR 92–7(9) by various courts does not limit this Ruling only to the initial denial notice received by an applicant. In *Robinson v. Shalala*, 1994 WL 119355 (S.D.N.Y. April 4, 1994) the court found that, despite its defects, there was no due process violation arising from the Secretary's initial denial notice because plaintiff requested reconsideration. However, a subsequent notice of reconsideration was flawed under *Gonza-*

*lez* because it did not fully inform plaintiff of the consequences of not seeking further administrative review. The plaintiff, who was acting pro se, did not request a hearing but instead filed a new application. Similarly in this case, nothing in this record indicates that claimant was represented by counsel at the time she received the 1989 Reconsideration Notice and failed to request a hearing.

Also in *Day*, the court held that a reconsideration denial notice, which did not distinguish between reapplying and appealing, was inadequate under *Gonzalez*. *Day*, 23 F.3d at 1065. However, the court held that a claimant must detrimentally rely on that inadequate notice in order to reopen the application:

> the only claimants who could have been injured by the inadequacy are those who detrimentally relied on the inadequate denial notice. A claimant relied to his or her detriment on the inadequate notice if he or she was denied benefits at the reconsideration level then received the inadequate notice, and thereafter filed a new application rather than continuing the appeal process, and then were presented by the Secretary with a claim of res judicata or received less in retroactive benefits than he or she would have had they successfully appealed initially.

*Id.*

■ Contrary to the ALJ's determination, claimant did rely to her detriment on the inadequate notice as defined by *Day*. Upon reconsideration, she was denied benefits and then received the inadequate notice. Rather than appealing from the denial of her initial application, she filed a new application. Although the ALJ did not use the specific words of res judicata to justify his decision, that was the theoretical basis for his refusal to consider claimant's initial application. He found that because claimant failed to timely seek review, her claim was barred by the 1989 Reconsideration Notice. In other

---

4. At the time of this court's decision, the decision in *Day* had not been released for publication in permanent law reports and is subject to revision or withdrawal.

5. The ALJ cites Social Security Ruling 91–5p which refers to situations in which the claimant lacked the mental capacity to understand the notice (Tr 15). Claimant does not address this Ruling nor suggest that she lacked the mental capacity to understand the notice.

words, the denial was a final decision. As a result, if claimant is disabled and entitled to benefits, then, according to the ALJ, those benefits would not be retroactive to her initial application. Instead, the ALJ limited the retroactive period of her potential benefits to January 7, 1989 forward. Thus, if claimant is entitled to benefits, she was injured by her failure to appeal the 1989 Reconsideration Notice, due to a shorter period for payment of benefits. As such, her Fifth Amendment right to procedural due process was violated.

If the ALJ correctly determined that claimant is not disabled, and her condition after January 6, 1989 was the same as her condition before January 6, 1989, then any error in this regard by the ALJ would be moot. However, as set forth below, the ALJ's determination as to claimant's disability was in error. Therefore, upon reconsideration, claimant's benefit period must be calculated based on her initial application filed June 7, 1988, rather than on her subsequent applications.

## II. *Whether the ALJ's Decision is Supported by Substantial Evidence*

■ Claimant asserts that after the ALJ found that she cannot perform her past relevant work in step four, he erred in finding in step five that she can do other substantial gainful activity. The parties agree that if claimant can no longer perform her past relevant work, then the burden is on the Secretary to show that claimant can perform other substantial gainful activity considering her age, education and work experience. *DeLorme v. Sullivan*, 924 F.2d 841, 850 (9th Cir.1991).

At the core of this dispute is whether claimant can lift more than 10 pounds and do "light work." The ALJ noted that claimant can do dishes, drive and cook, that she is not on pain medications, and that her complaints of back pain were not a salient feature of her testimony at the hearing. Considering this evidence and the assessment of Dr. Adams, the ALJ found that "[t]he nature and extent of claimant's routine daily activities supports the conclusion she can lift objects weighing up to 20 pounds and is capable of light work" (Tr 21). Because the ALJ found that claim-

ant is capable of lifting up to 20 pounds, he found her qualified to do "light work" under 20 C.F.R. § 404.1567(b). This finding is not supported by substantial evidence.

Claimant correctly notes that some of the relevant medical information provided by her attending physician, Dr. Taylor, as well as from a treating physician, Dr. Bernstein, was not considered. This evidence, which is dated after claimant's insured status period expired on September 30, 1990, along with the medical evidence during the time of her insured status period, contradicts the ALJ's findings that claimant can do "light work" rather than "sedentary work."

Both Drs. Taylor and Bernstein completed residual functional capacity forms in 1992. Each doctor limited claimant's lifting capacity to not more than 10 pounds (Tr 299, 304). Although citing these reports, the ALJ noted that these limitations arose only after claimant was diagnosed with diabetes in 1991, and do not necessarily relate back to the period before September 30, 1990 (Tr 21).

The ALJ also found that Dr. Taylor did not possess the level of expertise of Dr. Adams in orthopedic matters, and that Dr. Bernstein did not examine claimant until late 1991, beyond the insured status date of September 30, 1990. Nonetheless, the ALJ incongruously refers to a September 23, 1991 report by Dr. Bernstein (Tr. 275) which he then inaccurately summarizes. The ALJ summarized Dr. Bernstein's conclusion as follows: "Dr. Bernstein expressly states that the claimant did not complain of back pain, and he reported rather than being exacerbated by activity, claimant's sensation of a tightness, a corset like feeling around her waist, was alleviated with activity" (Tr 21). Dr. Bernstein actually reported that: "She basically has described ... a gradually worsening sensation of a "tight corset" about her abdomen.... She notes that this is worse at night, better during the day, and in fact, rarely bothers her during the day" (Tr 275).

Dr. Bernstein does not state that claimant's complaint may be alleviated by activity. Instead he supports claimant's testimony that she experiences pain when lying down (Tr 53).

Even more puzzling, the ALJ appears to be relying on medical information after September 30, 1990, which he earlier stated he would not consider. In other words, the ALJ relied on some of Dr. Bernstein's medical findings to support his conclusion that claimant is able to do "light work," but chose not to rely on all of Dr. Bernstein's reports or those from Dr. Taylor after September 30, 1990 which clearly state that claimant cannot lift more than 10 pounds.

Instead, in determining the amount of weight claimant can lift, which is central to the determination of whether she can do "light" or "sedentary work" and thus whether or not she is disabled, the ALJ relied heavily on the April 14, 1989, assessment by Dr. Adams, claimant's orthopedic surgeon (Tr 21). The ALJ noted that Dr. Adams advised claimant to avoid repetitive pushing and pulling motions, such as those associated with vacuuming, but otherwise could not identify any significant limitations on her ability to work (Tr 21). While this is an accurate description of Dr. Adam's assessment, Dr. Adams does not comment on the amount of lifting she can do (Tr 259–260). His report only addresses her right shoulder problem (Tr 259). Dr. Adams did not complete a residual functional capacity form or provide any other information addressing the amount of lifting claimant is capable of doing. In addition, Dr. Adams noted on January 16, 1989, that he only saw claimant one time in February 1987 regarding her back problem (Tr 253).

The ALJ also relies on the testimony of claimant during the hearing. When claimant was asked what would prevent her from holding a job that involved chiefly table work, allowed her to alternate between sitting and standing, and did not involve pushing and pulling, claimant replied that only her "strobe light" dizzy spells would prevent her from performing such work (Tr 21). Because those dizzy spells relate to a medical condition not present during her insured pe-

riod, the ALJ found that this limitation by claimant was not relevant.

However, the ALJ does not accurately reflect all of the testimony. The ALJ's question to claimant actually was:

> Would there be anything that would keep you from being able to work at a job where you wouldn't have to do any pushing or pulling or *heavy lifting*, you could sit at a table in whatever position is comfortable for you, and stand up whenever you would need, sit/stand whenever you would want,—

(Tr 67–68, emphasis added). To that question, which included a qualification as to lifting, claimant replied she would be able to perform such work except for the dizzy spells (Tr 68).

It should be noted that at no time during the hearing did the ALJ ask claimant if she had any difficulties with lifting or how much she could lift.[6] Claimant did report that the only aspect of her former job she could still do was dishes as it was "light, real light" (Tr 43–44). Yet the ALJ concluded that claimant was able to lift up to 20 pounds.

While the ALJ recites the findings by Dr. Samuel, a chiropractor, who saw claimant in 1989, and reported that she should not lift more than 10 pounds (Tr 267),[7] he apparently did not consider Dr. Samuel's testimony in making his findings. Nowhere does the ALJ address the merits of Dr. Samuel's report. While it is true that a chiropractor is not given the same weight as a licensed physician (20 C.F.R. § 404.1513), information from a chiropractor can be used to help the ALJ "understand how your impairment affects your ability to work." 20 C.F.R. § 404.-1513(e)(3). The ALJ did not provide any reasons for excluding Dr. Samuel's report.

The ALJ apparently determined that the medical input by Drs. Taylor and Bernstein subsequent to September 30, 1990, did not adequately distinguish between claimant's prior back condition and her recent

---

6. He did ask her how much the laundry bags weighed at her prior job, a job which the ALJ found claimant can no longer perform, but claimant did not know (Tr 42).

7. In fact, Dr. Samuel was the only medical professional to fill out a form which included a question as to the amount of weight claimant could lift prior to the expiration of her insured status.

diabetes diagnosis and, as such, their findings limiting her to "sedentary work" were not relevant (Tr 21). However, evidence of claimant's condition after September 30, 1990 may be relevant if it relates back to her medical condition during her insured period.

In *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir.1984) the court held that medical evidence of an applicant's condition after the expiration of insured status must be considered because it may be relevant to the earlier medical condition. "There can be no doubt that medical evidence from a time subsequent to a certain period is relevant to a determination of a claimant's condition during that period.... Any other rule would restrict unduly the availability of benefits under the Act." *Id.* at 1225. Halvorsen presented sparse medical records prior to the insured status expiration. Although noting that the ALJ's opinion states that he considered all the evidence, the court found that his analysis undercut that assertion.

> Only if we view the evidence from prior to 1965 in isolation, and perhaps not even then, could we say that the administrative law judge's decision was supported by substantial evidence, but the evidence must not be viewed in isolation.

*Id.* at 1226.

In *Mitchell v. Bowen*, 827 F.2d 387, 389 (8th Cir.1987), *citing Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir.1984), the court noted that " 'medical evidence of a claimant's condition subsequent to the expiration of the claimant's insured status ... bear[s] upon the severity of the claimant's condition before the expiration of ... her insured status.' "

It seems clear that the ALJ in this case failed to consider any medical information subsequent to September 30, 1990, except that portion which buttressed his decision, by claiming an inability to distinguish medical evidence relating to claimant's back problems or her diabetes. That claim is untenable.

Both Drs. Taylor and Bernstein filled out residual functional capacity and pain questionnaires. Although these were completed after September 30, 1990, and during a period when claimant also was diagnosed with diabetes, both doctors report that her pain is due to her back problem (Tr 302, 307). Dr. Taylor specifically notes, when limiting claimant's standing, sitting and lifting, that her capabilities "may vary, depending on how well she is doing with her back pain that day" (Tr 305).

Dr. Taylor also wrote a short letter to the Oregon Department of Human Resources on January 27, 1992. In that letter, referring to claimant, he states "I feel that she would be limited in standing for long periods of time and lifting and carrying and handling objects in a repetative [sic] motion. Otherwise I feel that she would be very fine for a sort of sitting-standing job" (Tr 292). While this letter does not limit claimant to lifting no more than 10 pounds, Dr. Taylor's recommendation conforms with his subsequent recommendation on October 27, 1992 when, in the more detailed residual functional capacity form, he limited claimant to lifting no more than 10 pounds (Tr 299). This court does not find Dr. Taylor's or Dr. Bernstein's 10 pound limitation in late 1992 inconsistent with any of their earlier findings. More importantly, this court finds that this evidence directly effects the determination as to whether claimant is disabled during her insured status period.

Relying on his determination that claimant can lift up to 20 pounds, the ALJ concluded that she was capable of performing "light work" under 20 C.F.R. § 404.1567(b). That regulation requires a person to be able to engage in work which includes lifting no more than 20 pounds. If claimant were unable to lift more than 10 pounds, then she would only be able to perform "sedentary work" under 20 C.F.R. § 404.1567(a). Upon determining that claimant was able to perform "light work," the ALJ relied on 20 C.F.R. 404 Subpt. P, App. 2, Table 2, the Residual Functional Capacity Grid for Light Work, to determine that claimant was not disabled under Rule 202.13.

■ However, because this court finds that the ALJ's conclusion that claimant is able to lift 20 pounds and is qualified to perform "light work," is not supported by substantial evidence, the ALJ's reliance on Rule 202.12 of the Guidelines for "light work" is misplaced. Instead, the ALJ should have

applied Rule 201.12, under the "sedentary work" Guideline, which would have directed a finding that claimant was disabled. Under Rule 201.12, a claimant is deemed disabled if claimant (1) is closely approaching advanced age (50–54), (2) is limited to "sedentary work," (3) has a high school education that does not provide for direct entry into skilled work and (4) is unskilled. Claimant meets all of these requirements.[8]

 The next issue is whether to remand this case for further corrective administrative proceedings or to reverse and remand for an award of benefits. Such a decision is within the discretion of the court. *Stone v. Heckler,* 761 F.2d 530, 533 (9th Cir.1985). A court may reverse and remand for an award of benefits where the administrative record has been fully developed and substantial evidence on the record as a whole indicates that the claimant is disabled. *Rodriguez v. Bowen,* 876 F.2d 759, 763, (9th Cir.1989); *Varney v. Secretary of Health and Human Services,* 859 F.2d 1396, 1399 (9th Cir.1988).

Here, if the sequential evaluation is pursued to a conclusion, the Secretary's regulations would direct a finding of disabled. Thus, this case is similar to *Doak v. Heckler,* 790 F.2d 26 (3rd Cir.1986) where the record did not support the ALJ's conclusions that claimant could do "light work." Instead, the record revealed that claimant could, at most, do "sedentary work" and had no transferable skills. The court reversed and remanded for an award of benefits, explaining:

> In this case, remand to the Secretary for a finding about work ability consistent with the records is inappropriate.... The record can support no more than a finding that claimant is able to do sedentary work and has no transferable work skills. Therefore, a holding of disability is compelled.

*Id.* at 30 (citation omitted). *See also Richardson v. Secretary of Health and Human Services,* 735 F.2d 962, 964 (6th Cir.1984) (reversing for an award of benefits where the

applicable Rule required a finding of disabled).

Therefore, it is appropriate in this case to reverse and remand for a finding of disability. In addition, this court finds that the 1989 Reconsideration Notice violated due process, and thus claimant's benefits should be calculated to begin in accordance with her initial application filed on June 7, 1988.

### *CONCLUSION*

The decision of the Secretary is reversed and remanded for a determination of benefits to be awarded to claimant in accordance with her initial application dated June 7, 1988.

IT IS SO ORDERED.

---

**8.** The ALJ found that claimant satisfied these requirements which are the same under Rules 202.13 and 201.12. The only difference in these rules is that a person who can perform "light work" is not disabled under Rule 202.13, while a person who can perform "sedentary work" is disabled under Rule 201.12.